Argued and submitted January 19, affirmed December 15, 2010

# Than EXAMILOTIS
## and Nicole Examilotis,
*Petitioners,*

*v.*

# DEPARTMENT OF STATE LANDS,
*Respondent.*

## Department of State Lands
## 700204; A139450

244 P3d 880

Daniel J. Stotter argued the cause for petitioners. With him on the briefs was Irving & Stotter LLP.

Karla H. Ferrall, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Wollheim, Presiding Judge, and Sercombe, Judge, and Carson, Senior Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Petitioners seek review of a final order of the director of the Oregon Department of State Lands (DSL) that affirmed the issuance of a fill/removal permit to the Coos County Salmon Trout Enhancement Program Commission (Coos STEP). Coos STEP applied for the permit in conjunction with its proposed plan to move and reconstruct a fish hatchery on Morgan Creek. The issues in this case concern inconsistencies between the statutory standards for issuing a fill/removal permit, ORS 196.825 (2005), *amended by* Or Laws 2007, ch 849, §§ 4, 5; Or Laws 2009, ch 342, § 2; Or Laws 2009, ch 343, § 20, and the standards set out in a DSL rule, OAR 141-085-0029 (Mar 27, 2006). Broadly speaking, the statutory standards require an evaluation of the effects of the fill or removal activity, whereas some of the regulatory standards speak to the effects of the "project" as a whole. DSL concluded that the broader scope of the rule exceeded its rule-making authority and applied the narrower statutory approval criteria to the permit. Petitioners claim that DSL erred in concluding that it lacked authority to broaden the permit standards in the rule and that the agency was bound to apply its own rule to the permit. Petitioners particularly contend that DSL erred in failing to apply two of the rule standards to the "project" as opposed to the fill and removal activities. Petitioners finally assert that one of the findings in the order lacks substantial evidence in the record. For the reasons that follow, we affirm.

## I. FACTS

The relevant facts, as found by the director, are as follows. In 1982, Coos STEP, through the Oregon Department of Fish and Wildlife (ODFW), began operating a fish hatchery on Priorly Creek in Coos County. In 1986, the hatchery was expanded to the confluence of Priorly Creek and Morgan Creek. In or about 1998, petitioner Nicole Examilotis purchased property on Morgan Creek just west of the hatchery; she later learned that the hatchery was actually on her property and not on the adjacent tax lot owned by the person who had given permission to Coos STEP and ODFW to expand the hatchery. After being notified of the situation, Coos STEP

and ODFW proposed to move the hatchery to a site further up Morgan Creek.

In December 2005, DSL received a joint fill and removal permit application from Coos STEP and ODFW to fill in rock along Morgan Creek for the new hatchery and to remove silt from behind a temporary dam. The application proposed to remove 71 square yards of structures related to the existing hatchery from the waterway and reconstruct the hatchery by adding 25 square yards of concrete and rock to the creek. The work proposed in the application that related directly to the waters of the state was to install a removable, flashboard diversion dam, a fishway, a main raceway with diversions at each end, a water intake channel, a fish bypass structure, and a manually operated fish sorting ladder. Coos STEP proposed to build a spawning pool and building further from the creek. DSL provided a comment period for interested parties and received objections from local landowners to the operation and maintenance of the proposed hatchery.

In response to concerns that arose during DSL's investigation into the impact of the proposed fill/removal on wetlands, Coos STEP submitted a revised permit application in April 2007. DSL then provided a second comment period and again received feedback from interested parties. DSL considered the comments and concluded that most were complaints regarding the operation of the proposed hatchery. In particular, DSL concluded that the neighbors' issues regarding the odor from the hatchery and traffic safety were outside its jurisdiction. In addition, the director found:

> "DSL considered all alternatives, including different sites for the hatchery. Coos STEP reviewed a number of alternative sites, including those suggested by [petitioners], and concluded that the alternative sites were not as good due to environmental concerns, the lack of access, or were not food fish areas designated by ODFW. ODFW considered and rejected alternatives to Coos STEP's proposal, including moving to Daniels Creek, which had inadequate water and no facilities, plus ownership issues. An alternative suggested by [petitioners] was on someone else's property and not feasible. DSL considered these alternatives and agreed with Coos STEP and ODFW that they were not feasible."

(Citations omitted.) Ultimately, on July 13, 2007, DSL granted the application from Coos STEP and issued a fill/removal permit, subject to various conditions.

In August 2007, petitioners requested a contested case hearing on the permit. DSL referred the request to the Office of Administrative Hearings, and an administrative law judge (ALJ) was assigned to conduct the hearing. Among the issues to be considered by the ALJ was "[w]hether the scope of DSL's review is limited to only the fill/removal parts of Coos STEP's application or whether it must review all parts of the application, including any concerns regarding the operation of the hatchery. ORS 196.825 and OAR 141-085-0029." In May 2008, the ALJ issued a proposed order resolving that issue, along with others raised by the petitioners. Following consideration of that proposed order, the director issued the final order now before us on review that, as far we can tell, is identical to the order proposed by the ALJ.

## II. THE FINAL ORDER

### A. *Statutory and Regulatory Framework*

Before discussing the conclusions reached by the director in the final order, and because doing so will provide helpful context, we describe the statutory and regulatory framework governing DSL's authority to issue fill/removal permits as it existed in April 2007, when DSL received Coos STEP's revised permit application.[1] At that time, ORS 196.810(1)(a) generally prohibited the removal of material from beds and banks of state waters and the filling of state waters without a permit. In determining whether to issue the permit, DSL was required to consider certain criteria pursuant to ORS 196.825. That statute provided, in part:

---

[1] ORS chapter 196 was amended by the legislature in 2007, and those amendments became effective on July 1, 2007. *See* Or Laws 2007, ch 849, §§ 19, 21. Because DSL received Coos STEP's revised application before the effective date of the 2007 amendments, they did not apply to DSL's determination of whether to issue the permit to Coos STEP. *See* ORS 196.825(10) ("In determining whether to issue a permit, the director [of DSL] may consider only standards and criteria in effect on the date the director receives the completed application."). We therefore refer throughout this opinion to the 2005 version of ORS chapter 196, unless otherwise indicated.

"(1) The Director of the Department of State Lands shall issue a permit to remove material from the beds or banks of any waters of this state applied for under ORS 196.815 if the director determines that *the removal* described in the application will not be inconsistent with the protection, conservation and best use of the water resources of this state as specified in ORS 196.805.[2]

"(2) The director shall issue a permit applied for under ORS 196.815 for filling waters of this state if the director determines that *the proposed fill* would not unreasonably interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation.

"(3) In determining whether or not a permit shall be issued, the director shall consider all of the following:

"(a) The public need for *the proposed fill* and the social, economic or other public benefits likely to result from *the proposed fill*. When the applicant for a fill permit is a public body, the director may accept and rely upon the public body's findings as to local public need and local public benefit.

"(b) The economic cost to the public if *the proposed fill* is not accomplished.

"(c) The availability of alternatives to *the project* for which *the fill is proposed.*

"(d) The availability of alternative sites for *the proposed fill.*

---

[2] ORS 196.805(1) announced the general policy underlying the authority of DSL to issue fill/removal permits:

"The protection, conservation and best use of the water resources of this state are matters of the utmost public concern. Streams, lakes, bays, estuaries and other bodies of water in this state, including not only water and materials for domestic, agricultural and industrial use but also habitats and spawning areas for fish, avenues for transportation and sites for commerce and public recreation, are vital to the economy and well-being of this state and its people. Unregulated removal of material from the beds and banks of the waters of this state may create hazards to the health, safety and welfare of the people of this state. Unregulated filling in the waters of this state for any purpose, may result in interfering with or injuring public navigation, fishery and recreational uses of the waters. In order to provide for the best possible use of the water resources of this state, it is desirable to centralize authority in the Director of the Department of State Lands, and implement control of the removal of material from the beds and banks or filling of the waters of this state."

"(e)   Whether *the proposed fill* conforms to sound policies of conservation and would not interfere with public health and safety.

"(f)   Whether *the proposed fill* is in conformance with existing public uses of the waters and with uses designated for adjacent land in an acknowledged comprehensive plan and zoning ordinances.

"(g)   Whether *the proposed fill* is compatible with the acknowledged comprehensive plan and land use regulations for the area where *the proposed fill* is to take place or can be conditioned on a future local approval to meet this criterion.

"(h)   Whether *the proposed fill* is for streambank protection.

"(i)   Whether the applicant has provided all practicable mitigation to reduce the adverse effects of *the proposed fill* in the manner set forth in ORS 196.800(10). If off-site compensatory wetland mitigation is proposed, the applicant shall document the impracticability of on-site compensatory wetland mitigation."

(Emphases added.)

In 2006, DSL, pursuant to its general rulemaking authority in ORS 196.692,[3] promulgated a rule under ORS 196.825 that established regulatory standards for its review of permit applications; those standards were substantially similar—but not identical—to the statutory criteria announced in ORS 196.825. Specifically, OAR 141-085-0029(3) (Mar 27, 2006) provided:

"To issue an individual removal-fill permit the Department must determine that *the proposed removal-fill activity* will

---

[3] ORS 196.692 provided:

"(1) [DSL] shall adopt rules to carry out the provisions of ORS 196.668 to 196.692, 196.800, 196.810, 196.825, 196.830, 196.850 to 196.860, 196.885, 196.905, 197.015, 197.279, 215.213, 215.283, 215.284, 215.418 and 227.350.

"(2) Rules adopted pursuant to subsection (1) of this section shall include rules governing the application for and issuance of permits to remove material from the beds or banks of any waters of this state or to fill any waters of this state including, but not limited to, clear and objective standards and criteria for determining whether to grant or deny a permit."

not be inconsistent with the protection, conservation and best use of the water resources of this state and would not unreasonably interfere with the paramount public policy of this state to preserve the use of its waters for navigation, fishing and public recreation, by:

"(a)   Considering the public need for *the project* including the social, economic or other public benefits likely to result from *the project.* If the applicant is a public body, the Department may rely on the public body's findings as to local public need and benefit;

"(b)   Considering the economic cost to the public if *the project* is not accomplished;

"(c)   Considering whether *the project* would interfere with public health and safety;

"(d)   Considering whether *the project* is compatible with the local comprehensive land use plan. The Department will not issue an individual removal-fill permit for *a project* that is not consistent or compatible with the local comprehensive land use plan and/or zoning ordinance. The Department may issue an individual removal-fill permit requiring the applicant to obtain local land use approval prior to beginning the authorized activity;

"(e)   Determining the degree to which, if at all, *the project,* will unreasonably interfere with navigation, fishing and public recreation uses of the waters of the state;

"(f)   Considering the degree to which, if at all, *the project* will increase erosion or flooding upstream and downstream of *the project* or redirect water from *the project* site onto adjacent nearby lands[;]

"(g)   Considering the practicable alternatives for *the project* in accordance with (4) as presented in the application;[4] and

"(h)   Considering practicable mitigation (including compensatory mitigation) for all reasonably expected

---

[4] OAR 141-085-0029(4) (Mar 27, 2006) provided, "The Department will issue a permit only upon the Department's determination that a fill or removal *project* represents the practicable alternative that would have the least adverse effects on the water resources and navigation, fishing and public recreation uses." (Emphasis added.)

adverse impacts of *project* development, as required by subsection (5).[5]"

(Emphases added.)

For purposes of OAR chapter 141, division 85, OAR 141-085-0010(169) (Mar 26, 2006) defined "project" to mean "the primary development or use intended to be accomplished (e.g. retail shopping complex, residential development)." In addition, OAR 141-085-0010(170) (Mar 27, 2006) defined "project area" to mean "the physical space in which the removal-fill takes place including any on site or off-site mitigation site," which encompassed "the entire area of ground disturbance, even though not within waters of the state, including all staging areas and access ways, both temporary and permanent."[6]

B. *Conclusions Reached in the Final Order*

In issuing the final order in this case, the director was thus tasked with reconciling OAR 141-085-0029 (the standards rule) and OAR 141-085-0010 (the definition rule) with ORS 196.825.[7] In the final order, the director, in a footnote, stated, "As explained below, DSL's review is limited by statute only to the fill/removal parts of the plan and therefore [petitioners'] issues are reviewed only under the statutory standard." The director later explained:

---

[5] OAR 141-085-0029(5) (Mar 27, 2006) provided:

"In determining whether or not an alternative might be the practicable alternative with the least adverse effects, the Department will consider the type, size and relative cost of *the project*, the condition of the water resources, and navigation, fishing and public recreation uses as depicted in the application. The financial capabilities of the applicant are not the primary consideration. The basic *project* purpose, logistics, use of available technology and what constitutes a reasonable *project* expense are the most relevant factors in determining the most practicable alternative. The applicant bears the burden of providing the Department with all information necessary to make this determination."

(Emphases added.)

[6] All references throughout the remainder of this opinion to OAR 141-085-0010 and OAR 141-085-0029 are to those versions that became effective March 27, 2006, and were in effect at the time DSL received petitioners' revised application.

[7] In completing that task, the director used the 2007 version of ORS 196.825, rather than the 2005 version of the statute that was in effect at the time DSL received Coos STEP's revised permit application. Petitioners have not assigned error to that aspect of the final order, and we therefore do not address it further.

"Any attempt by DSL to expand its scope of review by rule is beyond the scope of review set out in ORS 196.825 and related sections and is not permitted. DSL exceeded its authority when defining 'project' in OAR 141-085-0010(169) beyond the fill/removal parts of an application. DSL has established that its review of the 'project' is limited to the fill/removal parts of Coos STEP's application."

Consequently, the director reviewed the remaining issues raised by petitioners under only the statutory criteria; the director did *not* review those issues under any of the regulatory standards of OAR 141-085-0029. As to the criteria in ORS 196.825, the director concluded:

"DSL has shown that the fill and removal plan proposed by Coos STEP is consistent with the protection, conservation and best use of the water resources of this state, as specified in ORS 196.600 to 196.905, and would not unreasonably interfere with the paramount policy of this state to preserve the use of its waters for navigation, fishing and public recreation. DSL established that it considered the availability of alternatives to the proposed fill and removal plan and the availability of alternative sites. It further showed that the proposed fill or removal conforms to sound policies of conservation and would not interfere with public health and safety."

Regarding practical and feasible alternatives, the director stated further:

"DSL's review is not whether there were more practical and feasible alternatives to the proposed hatchery, but only whether there are more practical and feasible alternatives to the fill and removal plan proposed by Coos STEP. [Petitioners] argued that the barrier between the raceway and Morgan Creek was deteriorating and was not a good place for fill and removal, but as explained above, the barrier is reinforced by riprap and DSL accounted for possibility of deterioration by imposing a condition that the barrier be reinforced with the planting of vegetation. If this planting has not been done or if efforts to stop deterioration do not work, DSL has reserved authority in the permit to require more measures to prevent erosion."

The director thus determined that "DSL properly issued a permit to Coos STEP."

### III. ASSIGNMENTS OF ERROR

On review, petitioners raise several interrelated challenges to the final order. We address those challenges to the final order for errors of law and substantial evidence. *See* ORS 196.835 (2009) (providing, in part, that "[a]ppeals from the director's final order may be taken to the Court of Appeals in the manner provided by ORS 183.482"); ORS 183.482(8)(a), (c) (orders in a contested case reviewed to determine if "the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action" and if supported by "substantial evidence in the record").

In their first three assignments of error, petitioners contend that (1) two particularly relevant parts of OAR 141-085-0029(3) require DSL to assess the effects of "the project," *i.e.*, the entire fish hatchery facility: OAR 141-085-0029(3)(c) ("whether the project would interfere with public health and safety") and OAR 141-085-0029(3)(f) ("the degree to which, if at all, the project will increase erosion or flooding upstream and downstream of the project or redirect water from the project site onto adjacent nearby lands"); (2) DSL lacks authority to not apply those rules by construing them to be outside of its statutory authority to adopt; and, therefore, (3) DSL erroneously interpreted its rules and a remand is necessary for their application to the project.

DSL counters that (1) "the project," as used in the administrative rules, means the fill and removal activities, and DSL did not err in confining its review to those activities; (2) alternatively, the agency did not err in failing to apply those parts of OAR 141-085-0029 that exceeded the permit criteria set out in ORS 196.825. We conclude that (1) the term, "the project," is used in the administrative rules to cover activities and uses beyond any fill and removal; (2) DSL had authority to not apply rules that exceeded its rulemaking authority; and (3) DSL did not err in confining its review of the permit to the criteria announced in ORS 196.825.

■ ■ Again, OAR 141-085-0029(3)(c) and OAR 141-085-0029(3)(f) apply standards to "the project." In determining the meaning of an administrative rule, our role is the same as in determining the meaning of a statute, *i.e.*, "to determine the meaning of the words used, giving effect to the intent of

the enacting body." *Abu-Adas v. Employment Dept.*, 325 Or 480, 485, 940 P2d 1219 (1997). Our inquiry begins with an examination of the text and context of the rule itself. *Id.* To recall, OAR 141-085-0010(169) defined "project" to mean "the primary development or use intended to be accomplished (e.g. retail shopping complex, residential development)." In addition, as context, OAR 141-085-0010(170) defined "project area" to mean "the physical space in which the removal-fill takes place including any on site or off-site mitigation site," including "the entire area of ground disturbance, even though not within waters of the state, including all staging areas and access ways, both temporary and permanent." Thus, "project," as defined by OAR 141-085-0010(169), and as used in OAR 141-085-0029, possessed an expansive scope, reaching beyond the proposed fill or removal.

■      DSL, however, did not err in not applying those parts of OAR 141-085-0029 that required consideration of issues outside DSL's authority to issue permits under ORS 196.825. It is axiomatic that "an agency has only those powers that the legislature grants and cannot exercise authority that it does not have." *SAIF v. Shipley*, 326 Or 557, 561, 955 P2d 244 (1998). "In the absence of a statute which grants a presumption of validity to administrative regulations, an administrative agency must, when its rule-making power is challenged, show that its regulation falls within a clearly defined statutory grant of authority." *Ore. Newspaper Pub. v. Peterson*, 244 Or 116, 123, 415 P2d 21 (1966) (footnote omitted).

■      Under ORS 196.692(1), the rulemaking authority of DSL is limited to those rules that "carry out the provisions" of various statutes, including ORS 196.825. Put another way, the agency's rulemaking authority is confined to policies that implement its statutory authority and does not include the authority to issue rules that expand or neglect those responsibilities. OAR 141-085-0029 "carr[ies] out the provisions of" ORS 196.825, a statute that *requires* the director to issue a fill or removal permit if certain criteria are met. ORS 196.825(1) (the director "shall issue a permit to remove material * * * if the director determines that * * * [the proposed removal meets particular standards]"); ORS 196.825(2) (the

director "shall issue a permit * * * for filling waters of this state if the director determines that [the proposed fill meets specified criteria]"). DSL did not err, then, in confining the scope of its rule to the statutory directives in ORS 196.825. The question becomes whether ORS 196.825 allows consideration of the effects of "the project," as defined by OAR 141-085-0010(169), in issuing a fill or removal permit. We conclude that only one part of the statute applies to "the project," as distinguished from evaluation of fill and removal activities.

In construing ORS 196.825, we employ the familiar methodology of *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009), and *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). Under ORS 196.825(3)(c), the director was required to consider "[t]he availability of alternatives to *the project* for which *the fill is proposed*." (Emphases added.) There are no other statutory references to "project" in the approval criteria set out in ORS 196.825 and ORS 196.805.[8] Conversely, ORS 196.825(3)(d) required consideration of "alternative sites for the *proposed fill*." (Emphasis added.)

Given the separate requirements to consider alternatives to both "the project for which the fill is proposed" and alternative sites "for the proposed fill," it is plain that "project" means something different from "the proposed fill." The word "project" was not defined by any provision in ORS chapter 196. Therefore, as a word of common usage, we give "project" its "plain, natural, and ordinary meaning." *See PGE*, 317 Or at 611. Among its various meanings, "project" is defined as "a specific plan or design." *Webster's Third New Int'l Dictionary* 1813 (unabridged ed 2002). As used in ORS

---

[8] ORS 196.825(5) used the term "project" to mean the activities being evaluated under the approval criteria. ORS 196.825(5) provided, in part:

"If the director issues a permit, the director may impose such conditions as the director considers necessary to carry out the purposes of ORS 196.805, 196.830 and subsections (1) and (2) of this section and to provide mitigation for the reasonably expected adverse impacts from project development."

The director's authority to impose conditions is that necessary to mitigate adverse impacts where that mitigation allows compliance with the approval criteria in ORS 196.805, ORS 196.830, and ORS 196.825(1) and (2). We do not read ORS 196.825(5) as expanding the approval criteria beyond the standards set out earlier in the statutes.

196.825(3)(c) ("the project for which the fill is proposed"), then, the word "project" connotes a scope that reaches beyond the proposed fill, that is, the development facilitated by the proposed fill.

That meaning of "project" is corroborated by two other related statutes. ORS 196.825(11)(b) defined a "completed application" as

"a signed permit application form that contains all necessary information for the director to determine whether to issue a permit, including:

"(A) A map showing *the project site* with sufficient accuracy to easily locate *the removal or fill site*;

"(B) A *project plan* showing *the project site* and proposed alterations;

"* * * * *

"(E) If *the project* may cause substantial adverse effects on aquatic life or aquatic habitat within this state, documentation of existing conditions and resources and identification of the potential impact if *the project* is completed; [and]

"* * * * *

"(G) If *the project is to fill and remove* material from wetlands, a wetlands mitigation plan[.]"

(Emphases added.) "Project" is used in ORS 196.825(11) to mean an activity beyond the specific fill or removal; that meaning of "project" likely is the same as the term is used in ORS 196.825(3)(c). *See also* ORS 196.830(4) (use of "project" in statutory provision on criteria for waiving estuarine resource replacement as requiring consideration of the "economic and public need for the project," "public benefits resulting from the project," whether the "project is for a public use," and whether the "project is water dependent or * * * publicly owned and water related").

Thus, ORS 196.825(3)(c) required consideration of "alternatives to the project for which the fill is proposed," with "project" meaning the development facilitated by the proposed fill. In other respects, however, ORS 196.825 confined the approval criteria for a fill or removal permit to the

characteristics or effects of the proposed fill or removal. DSL was obligated to apply OAR 141-085-0029 consistently with those statutory parameters. This brings us to petitioners' specific contentions about the director's failure to apply OAR 141-085-0029(3)(c) and OAR 141-085-0029(3)(f).

■        Petitioners argue that DSL improperly failed to consider various public health and safety issues associated with the proposal to move the fish hatchery, including fecal matter, odor, and upland traffic impacts. Petitioners cite OAR 141-085-0029(3)(c) (regarding the public health and safety impacts of "the project") in support of their position. Under that regulatory standard, petitioners contend that, given the broad scope of the definition of "project" in OAR 141-085-0010(169), DSL was required to consider public health and safety issues beyond the areas of actual fill and removal.

The problem with petitioners' argument is that it assumes the validity of OAR 141-085-0029(3)(c). In the final order, however, the director stated that "DSL's review is limited by statute only to the fill/removal parts of the plan and therefore [petitioners'] issues are reviewed only under the statutory standard." Further, the director explained that "[a]ny attempt by DSL to expand its scope of review by rule is beyond the scope of review set out in ORS 196.825 and related sections and is not permitted." We infer, consistent with those statements and the director's decision not to apply any of the regulatory standards, that the director also implicitly determined that OAR 141-085-0029(3)(c) exceeded DSL's rulemaking authority. On that score, we agree with the director.

In reviewing a permit application, OAR 141-085-0029(3)(c) required DSL to consider "whether *the project* would interfere with public health and safety." (Emphasis added.) Given the regulatory definition of "project" discussed above, that standard required DSL to consider public health and safety impacts beyond those associated with the application's fill and removal components. By contrast, ORS 196.825(3)(e) required the director to consider only "[w]hether *the proposed fill* * * * would not interfere with public health and safety." (Emphasis added.) "Fill" was

defined by ORS 196.800(5) as "the total of deposits by artificial means equal to or exceeding 50 cubic yards or more of material at one location in any waters of this state." Thus, ORS 196.825(3)(e) required the director to review the application through a narrow lens, focused only on whether a proposed deposit in state waters of 50 cubic yards or more of material would interfere with public health and safety.

We conclude that the regulatory standard exceeded the agency's authority because it required DSL to review an application more broadly than would otherwise be required by statute. Therefore, because the public health and safety issues identified by petitioners—the fecal matter, odor, and traffic impacts associated with the proposal to move the fish hatchery—fall outside the confines of the director's review under ORS 196.825(3)(e), the director did not err in failing to consider those issues.

■    Petitioners next argue that DSL improperly failed to consider various erosion and flood issues associated with the proposal to move the fish hatchery, including erosion and flood impacts on adjacent uplands of neighboring properties as a result of the proposed diversion dam. Petitioners cite OAR 141-085-0029(3)(f) (regarding the erosion and flood impacts of "the project") in support of their position. Under that regulatory standard, petitioners contend that, given the broad scope of the definition of "project" in OAR 141-085-0010(169), DSL was required to consider erosion and flood issues beyond those associated with the areas of actual fill and removal.

Again, the problem with petitioners' argument here is that it assumes the validity of OAR 141-085-0029(3)(f). We again infer, consistent with the director's statements in the final order and the director's decision not to apply any of the regulatory standards in reviewing Coos STEP's application, that the director implicitly determined that OAR 141-085-0029(3)(f) exceeded DSL's rulemaking authority. As above, we agree with the director as to that determination.

In reviewing a permit application, OAR 141-085-0029(3)(f) required DSL to consider "the degree to which, if at all, *the project* will increase erosion or flooding upstream and downstream of *the project* or redirect water from *the project*

site onto adjacent nearby lands." (Emphases added.) Unlike the regulatory standard regarding public health and safety impacts, which had a comparable statutory analogue, the regulatory standard regarding erosion and flood impacts on nearby lands did not have such a comparable statutory analogue; on that ground alone, the regulation could exceed the statutory rulemaking authority of DSL. On the other hand, consideration of erosion and flood impacts on nearby lands may fall within the penumbra of several of the statutory criteria, including the portion of ORS 196.825(3)(e) that required consideration of "[w]hether *the proposed fill* conforms to sound policies of conservation" and ORS 196.825(3)(h) that required consideration of "[w]hether *the proposed fill* is for streambank protection." (Emphases added.)

Assuming, without deciding, that consideration of erosion and flood impacts of "the proposed fill" on nearby lands falls within the statutory authority, we nonetheless conclude that consideration of those impacts, as they relate to the broader "project," unquestionably exceeds the agency's statutory authority. Because the erosion and flood issues identified by petitioners—those associated with the diversion dam—fall outside consideration of impacts associated with the proposed fill, the director did not err in failing to consider them.

■ Petitioners finally contend that DSL's analysis of practicable alternatives is not supported by substantial evidence in the record. Petitioners note that, pursuant to OAR 141-085-0029(3)(g), (4), and (5), DSL was required to consider practicable alternatives to the project in issuing the permit. According to petitioners, "[t]he evidence presented by * * * DSL in the proceedings below clearly demonstrates that [Coos STEP] failed to provide substantial evidence in the administrative record to meet its burden as to the applicable approval criteria." More particularly, petitioners note that Coos STEP's application materials contained only general statements regarding the analysis of alternatives. Petitioners assert that "DSL's decision to approve this permit, based solely upon the limited record submitted by Coos STEP

constitutes a decision that is not adequately supported by substantial evidence in the administrative record."[9]

DSL responds that petitioners understate the extent of evidence in the record as it pertains to analysis of alternatives under ORS 196.825(3)(c) and OAR 141-085-0029(4). DSL notes that the final order relies on the testimony of three witnesses, as well as information in Coos STEP's application. Further, DSL contends that other evidence also exists in the record to support the final order.

In reply, petitioners observe that only the testimony of one witness, Lobdell, was cited to support the director's finding that "DSL considered all alternatives, including different sites for the hatchery." Petitioners, citing *Hodgin v. PSRB*, 127 Or App 587, 591, 873 P2d 466, *rev den*, 320 Or 272 (1994), contend that all the other evidence referred to by DSL was not the basis for the director's determination on the issue of alternatives and, therefore, should not be considered as the basis for upholding the agency's decision on judicial review. In addition, petitioners contend that DSL cannot rely on evidence that other parties considered alternatives to support its finding that DSL considered alternatives.

When we review a finding of fact for substantial evidence, we determine whether "the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c). An initial problem with petitioners' substantial evidence contention is that petitioners, in their opening brief, fail to specifically identify the finding(s) of fact in the order that they contend lack substantial evidence. Indeed, in their reply brief, petitioners point to only one finding of fact as lacking substantial evidence—the finding that "DSL considered alternatives, including different sites for the hatchery."

---

[9] To be clear, petitioners, in their opening brief, did *not* argue, much as they did in their other assignments of error, that DSL erred as a matter of law in improperly failing to consider the applicable regulatory standards under OAR 141-085-0029(3)(g), (4), and (5). Further, to whatever extent petitioners attempt to recast their fourth assignment of error in their reply brief as including such an argument, that argument is raised too late. *See Johnson v. Best Overhead Door, LLC*, 238 Or App 559, 563 n 2, 241 P3d 1186 (2010) ("A party may not raise an issue for the first time in a reply brief.").

We review that finding under the applicable standard of ORS 183.482(8)(c).

Petitioners' reliance on *Hodgin* to restrict the scope of our review to only that evidence referenced by the director in making the challenged finding is misplaced. *Hodgin* belongs to a line of cases that requires an agency to articulate the "substantial reason" for its action. In *Hodgin* we explained, "In reviewing a PSRB order, it is not enough that the record contain substantial evidence to support the PSRB's findings. 'The question is whether the evidence on which PSRB expressly relied supports what the agency did.'" 127 Or App at 591 (quoting *Martin v. PSRB*, 312 Or 157, 167, 818 P2d 1264 (1991)). That explanation in *Hodgin* has been echoed in other cases that discuss our review for substantial reason. *See, e.g., Goin v. Employment Dept.*, 203 Or App 758, 763, 126 P3d 734 (2006) ("Our substantial reason review requires a determination of whether [the agency's] findings of fact logically lead to its conclusions of law."). As such, *Hodgin* concerns the extent or adequacy of factual findings as a whole. It does not stand for the principle that petitioners suggest—that our review of a finding for substantial evidence is limited to reviewing only that evidence cited by the director in support of the challenged finding of fact.[10]

Accordingly, our review of the record reveals the following evidence in support of the director's finding. Coos STEP, in its revised application, stated that it had researched alternative locations for the facility for over two decades; that the new facility, as compared to the old facility, would significantly reduce impacts to the Morgan Creek; and that any other areas surveyed in the basin would have significantly more impacts to the watershed than the selected site on Morgan Creek. At the contested case hearing below, Lobdell, a natural resource coordinator with DSL, testified

---

[10] To the extent that petitioners' substantial evidence argument may be couched as a substantial reason argument, it is unpersuasive. Here, petitioners have clearly identified and challenged only one finding of fact by the director. The director, however, made several other findings that bear on the conclusion later in the order that "[t]he proposed plan for fill/removal of material in Coos STEP's application met and adequately addressed the applicable review criteria that there are no practical and feasible alternatives." Petitioners do not explain why the totality of the director's findings fails to logically lead to the director's ultimate conclusion, and that failure is fatal to a review under substantial reason.

that, although no specific alternative locations were described in Coos STEP's application, during the period for public comment, Coos STEP responded to concerns raised by petitioners and others about alternatives to the project site. Lobdell further testified that Coos STEP had looked at several sites on Daniels Creek, including sites suggested by petitioners, and had rejected those alternatives for various reasons, including that there was already an existing facility there and the Daniels Creek area had a greater amount of wetlands in the immediate project vicinity. The record also contains evidence of the specific written response provided by Coos STEP, which stated, in part:

"Alternative locations, including those proposed by [petitioners], were considered. Daniels Creek already had a STEP fish facility with its own fish production level, operated by another STEP group. Another piece of property suggested by [petitioners] has significant wetland characteristics for much of the year, not just during high water/flooding events. This property would be suitable for a wetland/wildlife habitat restoration project, but not a site suitable for an out-of-stream fish rearing facility as proposed."

In light of the above-stated evidence, we conclude that the director's finding that "DSL considered all alternatives, including different sites for the hatchery" is supported by substantial evidence.

## IV. CONCLUSIONS

In sum, DSL did not err in confining the scope of its rules to the requirements for issuing a fill or removal permit under ORS 196.825. Given that limitation, the director did not err in failing to apply OAR 141-085-0029(3)(c) and OAR 141-085-0029(3)(f) to the fish hatchery operations, as opposed to the particular fill or removal activities. Further, petitioners' substantial evidence challenge is not well taken.

Affirmed.